IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-695

No. COA 20-268

Filed 21 December 2021

Wake County, No. 17CRS209941

STATE OF NORTH CAROLINA

v.

WILLIAM JOSEPH BARBER, Defendant.

Appeal by Defendant from judgment entered 6 June 2019 by Judge Stephan R. Futrell in Wake County Superior Court. Heard in the Court of Appeals 11 August 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Matthew Tulchin, for the State.*

*C. Scott Holmes, Irving Joyner, and Malcolm Ray. Hunter, Jr., for the Defendant.*

DILLON, Judge.

¶ 1 Defendant was convicted in superior court of second-degree trespass by a jury for refusing to leave the office area of the North Carolina General Assembly when told by security personnel to do so. We conclude that the superior court had jurisdiction over the matter and that Defendant received a fair trial, free from reversible error.

I. Background

¶ 2       Defendant was charged with second-degree trespass, a misdemeanor, for refusing to leave the General Assembly complex when told to do so by an officer.

¶ 3       The State's evidence tended to show as follows:

¶ 4       Defendant led a group of approximately fifty (50) people through the General Assembly office complex, protesting the inaction by our legislature to implement certain health care policy. The protest, which included "call and response" chants led by Defendant, triggered complaints from legislative staff.

¶ 5       Under the rules governing the legislative complex, visitors "may not disturb or act in a manner that will imminently disturb the General Assembly[.]"[1] Disruptive visitors are told to stop their behavior, and if they refuse, they are asked to leave immediately. The rules warn, "A knowing violation of these rules is a Class 1 misdemeanor under G.S. 120-32.1(b)."[2]

¶ 6       In accordance with these rules, the General Assembly's Police Chief repeatedly told Defendant and the group he was leading to lower their noise level, or they would be subject to arrest. The Police Chief then specifically told Defendant to stop leading the chants and leave. Defendant, however, did not leave, and the protest continued in a manner that proceeded to disturb the work of legislative staff. Accordingly,

---

[1] Rules of State Legislative Building and Legislative Office Building Adopted by the Legislative Service Commission, Restated 15 May 2014, at 2.

[2] *Id.* at 6.

Defendant was charged with trespass.

Defendant was never tried in our district court division. Rather, he was tried, in the first instance, by a jury in our superior court division on the sole charge of second-degree trespass. The jury returned a guilty verdict, and the trial court entered judgment accordingly. Defendant timely appealed.

## II. Analysis

Defendant makes several arguments on appeal, which we address in turn.

### A. Subject Matter Jurisdiction of the Superior Court

Defendant argues that our superior court division lacked jurisdiction to try him for a misdemeanor charge because the charging document upon which the State proceeded was not an indictment returned by the grand jury, but rather a misdemeanor statement of charges drawn up by the prosecutor.

A defendant may properly raise the issue of subject matter jurisdiction at any time, even for the first time on appeal. *In re T.R.P.*, 360 N.C. 588, 595, 636 S.E.2d 787, 793 (2006). Challenges based on subject matter jurisdiction are reviewed *de novo*. *In re A.L.L.*, 376 N.C. 99, 101, 852 S.E.2d 1, 4 (2020).

Here, Defendant was indicted by the grand jury for second-degree trespass. Specifically, the grand jury issued a "presentment" directing the prosecutor to investigate the matter after hearing testimony from the legislative officer who had cited Defendant. A month later, the prosecutor sought the indictment, which was

returned by the grand jury and served on Defendant.

¶ 12    However, on the eve of trial, the prosecutor prepared and served on Defendant a different charging document, called a "misdemeanor statement of charges." This document charged Defendant with essentially the same crime as had been charged in the indictment. The State proceeded with the trespassing prosecution pursuant to the statement of charges document rather than the indictment.

¶ 13    Defendant makes a compelling argument on appeal that the procedure followed by the prosecutor was improper, an argument that may have been a winning one based on the case law cited. However, we must take note of a decision from our Supreme Court handed down last year, the reasoning of which compels us to conclude that Defendant was properly tried in our superior court division.

¶ 14    Our district court division generally has "exclusive, original jurisdiction" to try misdemeanors. N.C. Gen. Stat. § 7A-272(a) (2017). Our superior court division generally hears misdemeanor prosecution, in the exercise of a defendant's right to a trial *de novo*, only after a defendant has been found guilty of the charge in the district court division. *Id.* § 7A-271(a)(5).

¶ 15    However, there are limited situations where our superior court division may hear a misdemeanor charge without first being a trial in the district court. For instance, relevant to our analysis here, a defendant may be tried for a misdemeanor in superior court in the first instance "[w]hen the charge is initiated by presentment,"

*Id.* § 7A-721(a)(2), which is followed by an indictment.

> A presentment is a written accusation by a grand jury, made on its own motion and filed with a superior court, charging a person, or two or more persons jointly, with the commission of one or more criminal offenses. A presentment does not institute criminal proceedings against any person, but the district attorney is obligated to investigate the factual background of every presentment returned in his district and to submit bills of indictment to the grand jury dealing with the subject matter of any presentments when it is appropriate to do so.

N.C. Gen. Stat. § 15A-641(c) (2017).

As stated above, this procedure—presentment by the grand jury followed by an indictment—was followed here. However, the prosecutor then decided to proceed pursuant to an entirely different charging document, the misdemeanor statement of charges. There is statutory authority to proceed on a misdemeanor charge in superior court when hearing the matter *de novo* from a conviction in district court. However, our superior court does not have *original* jurisdiction to try a misdemeanor charged in a statement of charges. *See* N.C. Gen. Stat. § 7A-271(a) (outlining superior court's jurisdiction to hear misdemeanor cases).

The question before us is whether it was fatal that the prosecution proceeded pursuant to the statement of charges, where the superior court otherwise had jurisdiction to proceed on the indictment that followed the presentment.

Defendant contends that our Court's jurisprudence, specifically *State v. Wall,*

235 N.C. App. 196, 760 S.E.2d 386 (2014), compels us to conclude that the superior court lacked jurisdiction to proceed against Defendant for second-degree trespassing pursuant to a "statement of charges," notwithstanding that Defendant was properly indicted by a grand jury for the same offense. The reasoning in *Wall* does seem to support Defendant's position as explained below. Defendant's argument perhaps would have been a winning one until last year. However, we conclude that this issue is controlled by the reasoning of our Supreme Court's more recent opinion in *State v. Capps*, 374 N.C. 621, 843 S.E.2d 167 (2020).

¶ 19 Our 2014 decision in *Wall* relies on *State v. Killian*, 61 N.C. App. 155, 300 S.E.2d 257 (1983). In *Killian*, the defendant was tried in district court pursuant to a pleading, known as a "warrant," that charged him with a certain misdemeanor. He appealed his conviction to the superior court for a trial *de novo*. Since the superior court was not exercising *original* jurisdiction (as the defendant had already been convicted in our district court division), it was appropriate for our superior court to proceed pursuant to the original warrant. *Id.* at 158, 300 S.E.2d at 259. However, rather than trying him for the same charge, the prosecutor in *Killian* proceeded pursuant to a "statement of charges" pleading that charged the defendant for a different crime than the one alleged in the warrant. *Id.* at 155, 300 S.E.2d at 258.

¶ 20 Our Court in *Killian* held that the superior court had no jurisdiction to proceed on the statement of charges, as it alleged a crime *different from* the crime alleged in

the original warrant:

> "Because [the crime charged] is a misdemeanor, the district court had exclusive, original jurisdiction of the new offense. G.S. 7A-272(a). Until defendant was tried and convicted in district court and appealed to superior court for trial *de novo*, the superior court had no jurisdiction [and] is derivative and arises only upon an appeal from a conviction of the misdemeanor in district court[.] The superior court thus had no jurisdiction to try defendant for the new offense alleged in the statement [of charges], and the conviction accordingly must be reversed.

*Id.* at 158, 300 S.E.2d at 259 (citation and quotation omitted).

¶ 21 Thirty-one years later, in 2014, our Court decided *Wall*, the case relied upon by Defendant. *Wall* involved procedural facts similar to *Killian*, except in *Wall*, the prosecution issued a statement of charges prior to the trial *de novo* that charged the same crime (resisting a public officer) as charged in the magistrate's order, the charging document in the district court trial. *Wall*, 235 N.C. App. at 199, 760 S.E.2d at 388. Specifically, the magistrate's order used in the district court prosecution charged the defendant with "resisting a public officer, § 14-223"; and the statement of charges used in the trial *de novo* also charged the defendant with violating "§ 14-223." *Id.* at 198, 760 S.E.2d at 387.

¶ 22 The defendant in *Wall* argued that "the superior court lacked subject matter jurisdiction to try her on the misdemeanor statement of charges filed in superior court . . . because defendant was tried and convicted on a magistrate's order in district

court[,]" notwithstanding both documents alleged the same crime. *Id.* 198, 760 S.E.2d at 387. We agreed with the defendant's argument, specifically holding that this procedure was improper because:

> "[T]he State cannot "amend" a magistrate's order by filing a misdemeanor statement of charges. Doing so would change the nature of the original pleading entirely.
>
> * * *
>
> Thus, the superior court had no jurisdiction to try defendant for the new offense alleged in the statement of charges. Defendant's conviction must be vacated.

*Id.* at 199-200, 760 S.E.2d at 388.

Here, Defendant argues that the reasoning in *Wall* controls. His argument is as follows: While there may have been an appropriate charging document that would have conferred jurisdiction in the superior court division, any jurisdiction was lost when the prosecutor proceeded under a different charging document disallowed by our General Statutes. And jurisdiction cannot be found by treating the statement of charges as a mere amendment to the appropriate charging document.

We, however, must take note of a case decided by our Supreme Court last year, a case cited by neither party. In *State v. Capps*, 374 N.C. 621, 843 S.E.2d 167 (2020), our Supreme Court essentially determined that a statement of charges may be treated as an amendment to the appropriate charging document.

In *Capps*, the defendant was convicted of a misdemeanor in district court

pursuant to a warrant, a charging document allowed in district court prosecutions. *Id.* at 622, 843 S.E.2d at 168. While the matter was before the superior court in a trial *de novo*, the prosecutor filed a statement of charges that parroted the allegations contained in the original warrant, with one minor exception—the name of the victim whose property was stolen was changed from "Loves Truck Stop" to "Love's Travel Stops & Country Stores, Inc." *Id.* at 623, 843 S.E.2d at 168.

¶ 26 The defendant appealed, "arguing for the first time that the superior court lacked jurisdiction to try the misdemeanor[s] under the statement of charges." *Id.* 624, 843 S.E.2d at 169. Our Supreme Court, however, held that proceeding under the statement of charges was appropriate under two different theories. The theory relevant to this present matter is that the statement of charges was essentially "an amendment in substance" to the warrant. *Id.* at 627, 843 S.E.2d at 170. And since our General Statutes allowed for the warrant to be amended by reciting the proper name of the corporate victim rather than its trade name, the "amendment" was appropriate, notwithstanding that the amendment was drafted on a "statement of charges" form. *Id.* at 627, 843 S.E.2d at 170.

¶ 27 Of course, it could be argued that *Capps* is inapposite to the present case because, though our General Statutes allow for warrants to be amended, they specifically prohibit indictments from being amended by the prosecutor. *See* N.C. Gen. Stat. § 15A-923(e) ("A bill of indictment may not be amended."). However, our

Supreme Court has "interpreted prohibited amendments to mean any change in the indictment which would substantially alter the charge set forth in the indictment." *State v. Abraham*, 338 N.C. 315, 340, 451 S.E.2d 131, 144 (1994) (internal marks omitted). Accordingly, amendments to indictments that do not "substantially alter the charge" are permissible. *State v. Brinson*, 337 N.C. 764, 767, 448 S.E.2d 822, 824 (1994). This is because a minor change does not defeat the purpose of the indictment "to inform a party so that he may learn with reasonable certainty the nature of the crime of which he is accused[.]" *State v. Coker*, 312 N.C. 432, 437, 323 S.E.2d 343, 347 (1984).

Following the logic of *Capps*, we must conclude that the superior court properly had jurisdiction to proceed on the misdemeanor trespass charge. The presentment and subsequent indictment alleged that Defendant remained on "the premises [of] the North Carolina General Assembly, in the Legislative Building located at 16 W. Jones St., Raleigh[.]" The statement of charges contained similar language except that it described the location as "the premises of the State of North Carolina, the Legislative Building located at 16 W. Jones St. Raleigh[.]" As the premises in each is described as "the Legislative Building" with the address of "16 W. Jones St., Raleigh," we do not see how the change from "the premises of the North Carolina General Assembly" to "the premises of the State of North Carolina" constituted a substantial alteration. Defendant was not denied his right to be informed of the nature of the

crime for which he was accused.

In sum, the superior court had original jurisdiction to proceed with the misdemeanor charge where the matter was initiated by a presentment followed by an indictment. N.C. Gen. Stat. § 7A-271(a)(2). The statement of charges drafted by the prosecutor may be treated as an amendment to the original charging document rather than a new charging document. *Capps*, 374 N.C. at 627, 843 S.E.2d at 170. An amendment to an indictment is permissible so long as the amendment does not substantially change the nature of the charge as alleged in the indictment. *Brinson*, 337 N.C. at 767, 448 S.E.2d at 824. The amendment to the indictment in this case, as stated in the statement of charges, did not substantially alter the nature of the charge against Defendant. Therefore, the amendment was permitted, and the superior court had jurisdiction to proceed.

## B. Free Speech

Defendant argues that his First Amendment rights were implicated, and therefore, the trial court erred by disallowing certain evidence that went to prove that assertion. We disagree.

This issue concerns whether free speech protections are implicated when a defendant is charged with trespass for violating viewpoint neutral, conduct-based rules. "To resolve this issue, we must first decide whether [defendant exhibited] speech protected by the First Amendment, for, if it is not, we need go no further."

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985)

¶ 32　　　　The right to free speech and assembly, though "fundamental rights" are "not in their nature absolute." *State v. Dobbins*, 277 N.C. 484, 498, 457 (1971) (quoting *Whitney v. California,* 274 U.S. 357, 373 (1927) (Brandeis J, concurring)). "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *State v. Wiggins*, 272 N.C.147, 159, 158 S.E.2d 37, 46 (1967) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

¶ 33　　　　We conclude that the First Amendment is not implicated in the conduct for which Defendant was charged. This is not a case about free speech—it is a case about loud speech. Defendant was not expelled from the General Assembly for the content of his words. He was removed for their volume.

¶ 34　　　　Indeed, the text of the General Assembly's visitor rules does not speak to the nature or content of a visitor's speech; they are solely conduct based. Specifically, the rules disallow "visitors who disturb" and prohibit unruly behavior, such as making noises that impair others' ability to engage in conversation or impeding others' movement.

¶ 35　　　　Further, even if Defendant's First Amendment rights were implicated, we conclude that his rights were not violated as a matter of law. The visitor rules at

issue are reasonable "time, place, and manner" restrictions.

¶ 36 The United States Supreme Court has recognized that "[t]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government," *Postal Service v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981), and that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47 (1966).

¶ 37 Moreover, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius,* 473 U.S. 788 at 799-800.

¶ 38 The United States Supreme Court has recognized that government property is either a public forum, which can be limited or unlimited in nature, or a non-public forum. *Id.* at 799-800.

¶ 39 We hold that the interior of the General Assembly is not an unlimited public forum. Although important speech is conducted within the building, the building is not a quintessential community venue, such as a public street, sidewalk, or park. *See United States v. Grace*, 461 U.S. 171, 180 (1983) (holding that while the interior of the Supreme Court building may not be a public forum, the sidewalk abutting the

courthouse is a public forum). The interior of the General Assembly complex is comparable to a courthouse in this regard. Certainly, while citizens are free to visit the General Assembly and communicate with members and staff, the government may prohibit loud, boisterous conduct on a content-neutral basis that would affect the ability of members and staff to carry on legislative functions.

¶ 40 Also comparable to the General Assembly, we note that the inside of the United States Capitol has been held to be a non-public forum, *see Bynum v. United States Capitol Police Bd.*, 93 F. Supp. 2d 50, 56, 200 (D. D.C. 2000). But even if our General Assembly building can be characterized as a limited public forum, the General Assembly would still be allowed to enforce rules limiting the volume of visitor speech in the office areas where staff carry on the work of our legislative branch. *See Brown v. Louisiana*, 383 U.S. 131, 142 (1966) (holding that civil rights protestors have the right to hold a silent vigil in a racially segregated library but may not make a speech in the quiet portions of the library).

¶ 41 Our own Supreme Court has recognized that content-neutral time, place, or manner restrictions "are subjected to a less demanding but still rigorous form of intermediate scrutiny," where "[t]he government must prove that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *State v. Bishop*, 368 N.C. 869, 874-875, 787 S.E.2d 814, 818, (2016) (citing *McCullen v. Coakley*, 573 U.S. 464,

486 (2014)).

¶ 42     We conclude that the legislative rules serve a significant interest of limiting loud disruptions and that Defendant has various other channels to make his concerns known and to otherwise engage in protests of legislative policies. Accordingly, we conclude that Defendant's First Amendment rights were not violated by the application of the legislative rules that support his conviction.[3]

## C. Jury Instructions

¶ 43     Finally, Defendant argues that a portion of the jury instructions was misleading. Specifically, Defendant challenges the instruction describing one of the elements of second-degree trespass as that Defendant entered or remained on the premises of another "without authorization." N.C.P.I.-Crim. 214.31A (2017). Though a standard jury instruction, Defendant argues that the word "authorization" should have been replaced with "legal right."

¶ 44     Assuming *arguendo* that the court erred by not making this minor alteration, we conclude that the error had no effect on the outcome of the trial. *See State v.*

---

[3] Defendant makes other arguments concerning the implication of his First Amendment rights. For instance, Defendant contends that the legislative rules are unconstitutional "as applied" in his case; that the jury should have been instructed on the "constitutional" elements of trespass as applied in his case; and that the prosecution violated his rights under our state constitution to instruct his representatives. However, as we have concluded that Defendant's conviction stems from his conduct (unrelated to the content of his speech) and that his First Amendment rights were not otherwise violated, we conclude that Defendant has failed to show reversible error with respect to these other arguments.

*Green*, 258 N.C. App. 87, 93, 811 S.E.2d 666, 670 (2018) ("An error in jury instructions is prejudicial when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached[.]").

## III. Conclusion

We conclude that the superior court had jurisdiction over this matter and that Defendant had a fair trial, free from reversible error.

NO ERROR.

Judge CARPENTER concurs.

Judge INMAN concurs in part and concurs in the result in part.

INMAN, Judge, concurring in part and concurring in the result in part.

I concur fully in the majority's holdings that: (1) the misdemeanor statement of charges did not deprive the trial court of jurisdiction in light of *State v. Capps*, 374 N.C. 621, 843 S.E.2d 167 (2020); and (2) Defendant has not shown prejudicial error in the trial court's denial of his request to alter the jury instruction on trespass. I also concur in the majority's ultimate holding that Defendant's conviction is not subject to reversal on First Amendment grounds, but I write separately because I believe resolution of that issue requires a different analysis.

## I.    Conduct v. Expression

The majority treats its determination that the Building Rule[4] regulates conduct as dispositive of Defendant's First Amendment argument. But a law or regulation that principally concerns itself with conduct may also burden speech and be subject to First Amendment protections. *See, e.g., Hest Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289, 297, 749 S.E.2d 429, 435 (2012) ("[O]ur determination that the primary target of this regulation is conduct rather than speech does not neatly end the inquiry. Because regulations that legitimately restrict conduct may still unduly burden speech rights, we must carefully evaluate the plaintiffs' assertions that the speech at issue here implicates the First Amendment."). Such incidental burdens are

---

[4] The specific rule at issue is Rule III.C.2. of the Rules of State Legislative Building and Legislative Office Building Adopted by the Legislative Services Commission, Restated 15 May 2014. For clarity and ease of reading, I refer to Rule III.C.2. as the "Building Rule" and the entire set of rules as the "Building Rules."

subject to judicial review under the test announced in *United States v. O'Brien*, 391 U.S. 367, 20 L. Ed. 2d 672 (1968):

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 20 L. Ed. 2d at 680. *See also Hest*, 366 N.C. at 300, 749 S.E.2d at 437 (noting that "courts have traditionally applied the test from . . . *O'Brien*" to regulations aimed at conduct that incidentally burden speech). And the *O'Brien* test is, at bottom, largely indistinguishable from the time, place, and manner restriction test applicable to content-neutral restrictions on speech. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298, 82 L. Ed. 2d 221, 230 (1984) (noting that the *O'Brien* test "in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions").

¶ 48    Applying *O'Brien* to this case, whether the Building Rule is characterized as primarily regulating conduct that incidentally burdens speech (as intimated by the majority) or as a time, place, and manner restriction (as contended by Defendant), it is subject to similar intermediate scrutiny under the First Amendment. *See, e.g., Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 386, 145 L. Ed. 2d 886, 897 (2000)

(describing the *O'Brien* test as "intermediate scrutiny" alongside "the similar standard applicable to merely time, place, and manner restrictions").

¶ 49 In my view, the Building Rule places at least an incidental burden on speech, as it explicitly includes "singing, clapping, shouting, [and] playing instruments" as "nonexclusive examples of behaviors that may disturb the General Assembly." If a city noise ordinance that "forbids deliberately noisy or diversionary activity that disrupts or is about to disrupt normal school activities," *Grayned v. City of Rockford*, 408 U.S. 104, 110-11, 33 L. Ed. 2d 222, 229 (1972), is subject to intermediate First Amendment scrutiny as a time, place, and manner restriction on expression, *id.* at 115-17, 33 L. Ed. 2d at 231-33, it is hard to discern how the Building Rule is not also a time, place, and manner restriction subject to the same level of First Amendment review.

## II.    Forum Analysis

¶ 50 That the Building Rule at issue here involves a content-neutral time, place, and manner restriction also leads me to conclude that the hallway in which Defendant was arrested is a designated public forum, if not a traditional public forum.[5] To identify a designated public forum, we must "look[] to the policy and

---

[5] The majority holds that the hallway where Defendant was arrested is not an "unlimited public forum." I understand the majority to mean that the hallway is not a "traditional public forum" or a "designated public forum" as those terms are used in First

*INMAN, J., concurring in part and concurring in the result in part*

practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," while also considering "the nature of the property and its compatibility with expressive activity." *Cornelius v. NAACP Legal Defense Educ. Fund, Inc.*, 473 U.S. 788, 802, 87 L. Ed. 2d 567, 580 (1985).

¶ 51 As the Building Rules are written, visitors are allowed to speak in the hallway where Defendant was arrested *about anything and to anyone*; the only limitation is that the speech fit within content-neutral restrictions tracking the intermediate scrutiny test applicable to public fora.[6] In other words, the General Assembly allows, by policy, any and all speech that falls within a content-neutral time, place, and manner restriction—the precise type of restriction permitted in either a traditional or designated public forum. The Chief of the North Carolina General Assembly Police Department testified:

> [W]hen I'm at various protest rallies, advocacy days, the content of what people are saying has no bearing on my actions. . . . What you're saying, what you're advocating

---

Amendment caselaw. *See Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 264 n.6 (4th Cir. 2005) ("In the context of a First Amendment claim, the phrase 'public forum' is a term of art, as are 'limited public forum,' designated 'public forum,' and 'non-public forum.' " (citations omitted)); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46, 74 L. Ed. 2d 794, 804-05 (1983) (defining and distinguishing between traditional public fora and designated public fora).

[6] Building Rule III.C.4. also prohibits signs on handsticks, signs affixed to the Legislative Complex, and signs that are used to disturb the General Assembly. This regulation, too, is a content-neutral regulation on the manner of speech.

> for or what you're protesting against, or what you're protesting for has absolutely no bearing on my decisions or my directions or my instructions to my officers, and it would be improper and illegal if it did.

¶ 52        Nor does open public discussion conflict with the nature of the State Legislative Building. If it did, the General Assembly presumably would have chosen a more restrictive policy than a content-neutral time, place, and manner restriction when, "[t]o make visitors feel welcome and at the same time to make it possible for the General Assembly to function effectively," it adopted the Building Rules. Indeed, the State Legislative Building may be the *most* appropriate location for open public discourse in light of *both* these aims. *See Reilly v. Noel*, 384 F. Supp. 741, 747 (D.R.I. 1974) ("[T]here is no more appropriate place for citizens to express their views on issues of social and political significance and to communicate their feelings to their elected representatives than at the State Capitol." (citations omitted)); *Women Strike for Peace v. Morton*, 472 F.2d 1273, 1287 (D.C. Cir. 1972) ("There is an unmistakable symbolic significance in demonstrating [as close as possible to the seat of government] which, while not easily quantifiable, is of undoubted importance in the constitutional balance."); *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 178-79, 50 L. Ed. 2d 376, 387 (1976) (Brennan, J., concurring) ("[W]hen . . . a government body has either by its own decision or under statutory command, determined to open its decisionmaking processes to public view and

participation . . . the state body has created a public forum dedicated to the expression of views by the general public."). Based on stated policy, practice, and the State Legislative Building's purposes, Defendant has shown that the office hallway[7] has been "opened for use by the public as a place for expressive activity," *Perry Educ. Ass'n*, 460 U.S. at 45, 74 L. Ed. 2d at 805, and, to the extent it was not traditionally a public forum,[8] it has been intentionally designated as such. In short, I would hold that Defendant had every right to engage in protected speech in the hallway of the Legislative Building subject to reasonable time, place, and manner restrictions that comport with the First Amendment.

## III. As-Applied Challenge and Jury Instruction on Constitutional Elements of Trespass

Though I diverge from the majority's analysis of Defendant's First Amendment argument, I concur in its ultimate conclusion that Defendant's constitutional rights were not violated by the trespass conviction. The Building Rule Defendant violated is a reasonable time, place, and manner restriction that survives intermediate

---

[7] This analysis applies to the hallways and other areas of the Legislative Building that are generally accessible to the public during business hours; this appeal does not involve the offices of General Assembly members and their staff.

[8] "In general, the grounds and buildings of state and federal capitol complexes and similar buildings have consistently been held to be public fora." *ACT-UP v. Walp*, 755 F. Supp. 1281, 1287 (M.D. Pa. 1991) (citations omitted).

scrutiny.[9]  It is not meaningfully different from the content-neutral noise ordinance that was upheld as a reasonable time, place, and manner restriction by the United States Supreme Court in *Grayned*, 408 U.S. at 116-21, 33 L. Ed. 2d at 231-35, and Defendant has not argued to this Court that the Building Rule fails to meet this standard.[10]  Defendant's as-applied argument fails.

¶ 54        I also conclude that Defendant's prosecution did not violate his rights under Article I, Section 12 of the North Carolina Constitution "to instruct [his] representatives, and to apply to the General Assembly for redress of grievances."  To the extent that this argument is encompassed by Defendant's underlying First Amendment challenge, it fails alongside that as-applied claim.  *See State v. Frinks*, 284 N.C. 472, 485, 201 S.E.2d 858, 866-67 (1974) (holding a defendant's First Amendment and Article I, Section 12 challenges to his prosecution for violating a parade ordinance failed because the ordinance complied with the First Amendment).  Defendant cites no North Carolina caselaw interpreting or applying Article I, Section 12 of the North Carolina Constitution.  We have held that the right to instruct

---

[9] Because I believe the hallway at issue to be a public forum and the Building Rule to be a time, place, and manner restriction subject to intermediate scrutiny, I do not join in the majority's analysis treating the hallway as a limited public forum.  *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470, 172 L. Ed. 2d 853, 863 (2009) (holding that regulations in limited public forums are constitutional if they "are reasonable and viewpoint neutral").

[10] Defendant conceded at oral argument that a rule prohibiting disruptions to allow persons to work is a reasonable time, place, and manner restriction.

*INMAN, J., concurring in part and concurring in the result in part*

"reflect[s] a right of the people to 'teach' or 'advise' their representatives, . . . [and] protects the ability of the people to contact their elected representatives and convey their views about the decisions those representatives are tasked with making on their behalf." *Common Cause v. Forest*, 269 N.C. App. 387, 392-93, 838 S.E.2d 668, 673 (2020). But I am not convinced that Defendant's rights under Article I, Section 12 were violated because he was prohibited from exercising his petition rights in his preferred manner. For example, Defendant could have: (1) continued to instruct and petition the General Assembly within the reasonable time, place, and manner restrictions imposed by the Building Rules, including by lowering the volume of his voice and urging his supporters to do the same; (2) distributed a letter, petition, or other writing to legislative offices by mail, facsimile, or email; (3) addressed representatives personally in another public setting outside the Legislative Building; (4) contacted legislative offices by phone; or (5) hired a lobbyist to speak with legislators.[11] *Cf. Clark*, 468 U.S. at 293, 82 L. Ed. 2d at 227 (holding reasonable time, place, and manner restrictions are constitutional "provided that they are justified

---

[11] Room numbers, telephone numbers, and email addresses for all members of the General Assembly are accessible to the public on the General Assembly's website. *Contact Info*, North Carolina General Assembly, *available at* https://www.ncleg.gov/About/ContactInfo (last visited December 12, 2021). Registered lobbyists may be identified through the Secretary of State's website. *North Carolina Secretary of State Lobbying Compliance Search*, North Carolina Secretary of State, *available at* https://www.sosnc.gov/online_services/search/by_title/_lobbying (last visited December 12, 2021).

without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, *and that they leave open ample alternative channels for communication of the information*" (emphasis added)); *Pell v. Procunier¸* 417 U.S. 817, 827-28, 41 L. Ed. 2d 495, 504-05 (1974) (holding inmates' First Amendment rights, including the right to petition the government for a redress of grievances, was not violated by a reasonable time, place, and manner restriction "in light of the alternative channels of communication that are open to prison inmates"). Absent caselaw applying Article I, Section 12 in the manner requested by Defendant and expanding it to invalidate regulations that are constitutional under the First Amendment, I agree with the majority's determination that Defendant's as-applied challenge under the North Carolina Constitution fails.

¶ 55 Defendant also argues that the trial court erred in failing to instruct the jury to find necessary "constitutional facts" on the "constitutional elements" of the trespass charge, namely, whether Defendant violated a reasonable time, place, and manner restriction by demonstrating so loudly as to disrupt the work of the General Assembly within the meaning of the Building Rule. But Defendant's trial counsel did not argue that such an instruction was constitutionally required. And while trial counsel did request an amendment to the jury instruction on trespass to distinguish that Defendant must be found to have been in the Legislative Building "without legal right" instead of "without authorization" to be guilty, he did not ground this argument

in First Amendment or other constitutional concerns. Defendant's constitutional jury instruction argument—raised for the first time on appeal—is not preserved for review given trial counsel's failure to distinctly argue those grounds below. *See Marketplace Antique Mall, Inc. v. Lewis*, 163 N.C. App. 596, 601, 594 S.E.2d 121, 125 (2004) ("As a review of the transcript reveals that plaintiffs did not object to the jury instructions on the bases contended in their brief, these issues were not preserved for appeal and are therefore not properly before this Court." (citation omitted)); N.C. R. App. P. 10(a)(2) (2021) ("A party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection.").

¶ 56     Although Defendant did preserve his challenge to the jury instruction on state law grounds, I concur with the majority's conclusion that he has failed to show prejudice. Defendant's trial counsel argued the factual question of whether Defendant violated the Building Rule to the jury despite his unsuccessful request to alter the jury instruction on trespass. He repeatedly contended in closing that the State had failed to show Defendant was loud enough to cause a disturbance in violation of the Building Rule. Likewise, the prosecutor argued in closing that the "without authorization" element of trespass was satisfied because "there are rules . . . that govern what behavior is allowed in that building when a member of the

general public enters. He violated those rules, and at the point that he violated those rules he lost his authority to stay there."

For the reasons stated herein, I concur in the result reached by the majority regarding Defendant's First Amendment and related arguments. I concur fully in the remainder of the majority opinion.